UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND

**UNITED STATES OF AMERICA**

v.

**BLAINE KLUGE**

No. 1:22-cr-42-RDB

**MOTION TO DISMISS INDICTMENT ON SECOND
AMENDMENT GROUNDS**

The government charged Blaine Kluge in a one-count indictment with possessing a firearm silencer that is not registered with the Treasury, in violation of 26 U.S.C. § 5861(d). Convicting Mr. Kluge of that offense would violate his Second Amendment rights. Under the Second Amendment's "plain text," silencers qualify as "arms" because their noise-suppressing capability makes them necessary to the safe and effective use of firearms. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2129 (2022). The Constitution therefore "presumptively protects" the possession of silencers, and § 5861(d) violates the Second Amendment unless the government can demonstrate that the statute "is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. The government will be unable to make that showing. Although a handful of states began requiring the registration of firearms in the late 19th and early 20th centuries, there was no widespread tradition of requiring firearm registration around 1791, when the Second Amendment was ratified. Under the Supreme Court's recent opinion in *Bruen*, the lack of "a comparable tradition of regulation" in the founding era dooms § 5861(d). The Court should therefore dismiss the indictment.

I.      **Legal background**

    A.      **Statutory scheme**

The National Firearms Act (NFA) sets out "an interrelated statutory system for the taxation of certain classes of firearms." *Haynes v. United States*, 390 U.S. 85, 87 (1968). Relevant here, the NFA and its implementing regulations instruct the Secretary of the Treasury to "maintain a central registry of all firearms in the United States which are not in the possession or under the control of the United States," known as the National Firearms Registration and Transfer Record (NFRTR). 26 U.S.C. § 5841(a). Any firearm manufacturer is required to "register each firearm he manufactures, imports, or makes" in the NFRTR. *Id.* § 5841(b). To register a firearm, a manufacturer must file a notice "set[ting] forth the name and address of the manufacturer, . . . the date of manufacture, the type, model, length of barrel, overall length, caliber, gauge or size, serial numbers, and other marks of identification." 27 C.F.R. § 479.103; *see also* 26 U.S.C. § 5841(a).

Once a firearm is registered in the NFRTR, it "shall not be transferred" until its current possessor has filed, and the secretary has approved, an application "for the transfer and registration of the firearm" in the name of the transferee. 26 U.S.C. § 5812(a), (b). The new registration is then recorded in the NFRTR. *See* 27 C.F.R. § 479.101(b).

The NFA makes it "unlawful for any person . . . to receive or possess a firearm" that "is not registered to him in the National Firearms Registration and Transfer Record." 26 U.S.C. § 5861(d). Under the NFA, a firearm includes "any firearm muffler or firearm silencer," which is defined as "any device for silencing, muffling, or diminishing the report of a portable firearm." *Id.* § 5845(a)(7); 18 U.S.C. § 921(a)(3)(C), (24). "In this context, the word 'report' refers to the sound of a gunshot." *Innovator Enters., Inc. v. Jones*, 28 F. Supp. 3d 14, 18 n.1 (D.D.C. 2014).

### B. The Second Amendment

The Second Amendment provides that "[a] well regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court held the Second Amendment codified a pre-existing individual right to keep and bear arms. 554 U.S. 570, 595 (2008). The "central holding" of *Heller*, the Court later explained, was that "the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home." *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010).

Following *Heller* and *McDonald*, the Fourth Circuit developed a two-step inquiry for deciding Second Amendment challenges. That test required courts to determine (1) whether a challenged statute "burdens or regulates conduct that comes within the scope of the Second Amendment," and if so, (2) "whether the government c[ould] justify, under the appropriate level of scrutiny, the burden imposed on [a challenger's] Second Amendment rights." *United States v. Chester*, 628 F.3d 673, 680-82 (4th Cir. 2010). The Supreme Court's recent *Bruen* opinion, however, rejected that approach. Instead of balancing means and ends, *Bruen* instructed lower courts to focus solely on "constitutional text and history." 142 S. Ct. at 2128-29.

*Bruen* directs courts to begin by asking whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 2126. If it does, then "the Constitution presumptively protects that conduct." *Id.* Answering this threshold question in *Bruen* was straightforward. At issue there was a New York law providing that, to obtain a permit to carry a handgun in public, an applicant had to demonstrate "proper cause," i.e., "a special need for self-protection distinguishable from that of the general community." *Id.* at 2122-23. The Court

"ha[d] little difficulty concluding" that "the Second Amendment protects [the petitioners'] proposed course of conduct—carrying handguns publicly for self-defense." *Id.* at 2134. As the Court explained, "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms." *Id.* The Second Amendment therefore "presumptively guarantees" a right to carry firearms in public, and New York's "proper cause" requirement, which burdened that right, could pass constitutional muster only if the state overcame the presumption. *Id.* at 2129-30, 2135.

To rebut the presumption of unconstitutionality, *Bruen* held, "the government may not simply posit that [a] regulation promotes an important interest." *Id.* at 2126. "Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* This test requires courts to "consider whether historical precedent . . . evinces a comparable tradition of regulation." *Id.* at 2131-32. If "no such tradition" exists, then the statute being challenged is unconstitutional. *Id.* at 2132. And insofar as there are "multiple plausible interpretations" of an ambiguous historical record, courts must "favor the one that is more consistent with the Second Amendment's command." *Id.* at 2141 n.11. Put differently, the tie goes to the Second Amendment claimant. *See also id.* at 2139 (concluding that where "history [is] ambiguous at best," it "is not sufficiently probative to defend [a statute]").

The *Bruen* Court explained that "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Id.* at 2136 (emphasis in original). For that reason, the relevant "historical tradition" for purposes of a federal gun

regulation is that which existed in 1791, when the Second Amendment was ratified. *Id.* at 2136. Courts may look to the tradition of firearms regulation "before . . . and even after the founding" period, but they should do so with care. *Id.* at 2131-32. The Court cautioned, for example, that "[h]istorical evidence that long predates [1791] may not illuminate the scope of the [Second Amendment] right if linguistic or legal conventions changed in the intervening years." *Id.* at 2136. Courts should not "rely on an ancient practice that had become obsolete in England at the time of the adoption of the Constitution and never was acted upon or accepted in the colonies." *Id.*

Conversely, courts must "guard against giving postenactment history more weight than it can rightly bear." *Id.* Evidence "of how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century represent[s] a critical tool of constitutional interpretation." *Id.* But the farther forward in time one goes from 1791, the less probative historical evidence becomes. *See id.* at 2137 ("As we recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources."). Evidence from "the mid- to late-19th-century" provides little "insight into the meaning of the Constitution in [1791]." *Id.* Courts should therefore credit such history to the extent it provides "confirmation" of prior practice with which it is consistent, but should otherwise afford it little weight. *Id.* After all, "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id.* (emphasis in original); *see also id.* ("[T]o the extent later history contradicts what the text says, the text controls.").

5

The Court in *Bruen* held that because New York could not point to a robust tradition of regulations similar to the "proper cause" requirement, the state's statute violated the Second Amendment. *Id.* at 2138-56. In reaching that conclusion, the Court did not elaborate a comprehensive scheme for evaluating historical evidence, but it did stake certain guideposts for lower courts to follow. The Court said, for instance, that "[i]n some cases," the historical inquiry "will be fairly straightforward":

> [W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

*Id.* at 2131; *see also id.* (explaining that if "the Founders themselves could have adopted" a particular regulation "to confront" "a perceived societal problem," but did not do so, then that regulation is unconstitutional today).

In "other cases," challenged statutes will "implicat[e] unprecedented societal concerns or dramatic technological changes," which "may require a more nuanced approach." *Id.* at 2132. When firearms pose "regulatory challenges" that are "not . . . the same as those that preoccupied the Founders in 1791," the "historical inquiry that courts must conduct will often involve reasoning by analogy." *Id.*; *see also id.* (directing courts to use "analogical reasoning" when confronting "present-day firearm regulations" that "were unimaginable at the founding"). Deciding "whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are relevantly similar." *Id.* The Court in *Bruen* declined to "provide an

exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," but it did identify "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132-33. In other words, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense [i.e., the 'how'] and whether that burden is comparably justified [i.e., the 'why'] are *central* considerations when engaging in an analogical inquiry." *Id.* at 2133 (emphasis in original).

Whether based on "distinctly similar" precursors or merely historical analogues, the "comparable tradition of regulation" must be robust. *See id.* (requiring "a well-established and representative" historical analogue); *id.* at 2137 (explaining that "a governmental practice" can "guide [courts'] interpretation of an ambiguous constitutional provision" *if* that practice "has been open, widespread, and unchallenged since the early days of the Republic"). A handful of "outlier[]" statutes or cases from a small number of "outlier jurisdictions" do not make out a historical tradition. *Id.* at 2153, 2156. The Court expressed "doubt," for instance, that statutes from only three of the original thirteen colonies would be sufficient to establish a relevant tradition. *Id.* at 2142. And in evaluating 19th-century "surety laws" that New York argued were precursors to its "proper cause" requirement, the Court discounted two of those ten laws—which were closest to New York's—as unrepresentative. *See id.* at 2148 n.24.

Finally, *Bruen* emphasized—repeatedly—that "the burden falls on [the government] to show that [a statute] is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2135. The "[g]overnment bears the burden" of "affirmatively prov[ing] that its firearms regulation is part of the historical tradition that delimits the outer bounds of

7

the right to keep and bear arms." *Id.* at 2127, 2130. Consistent with "the principle of party presentation," courts are "entitled to decide a case based on the historical record compiled by the parties." *Id.* at 2130 n.6. As a result, courts "are not obliged to sift the historical materials for evidence to sustain [a] statute. That is [the government's] burden." *Id.* at 2150; *see also id.* at 2149 n.25 ("[T]he burden rests with the government to establish the relevant tradition of regulation.").

## II.  Argument

Under the "plain text" of the Second Amendment, a silencer qualifies as an "arm[]," and the Constitution therefore "presumptively protects" keeping that item in one's home. Mr. Kluge is unaware of any "historical tradition" of statutes requiring citizens to register their silencers, or even other arms, with the government. Unless the government can establish such a tradition, the indictment must be dismissed as violative of Mr. Kluge's Second Amendment rights.

### A.  Silencers are "arms" for Second Amendment purposes.

Silencers receive the *explicit* protection of the Second Amendment because they constitute "arms" (or accessories to arms). And even if they did not, silencers would still fall within the scope of the Second Amendment's *implicit* guarantee because their use is indispensable to exercise of the core Second Amendment right, i.e., the use of a gun for self-defense in the home.

#### 1.  Explicit protection

*Heller* defined "arms" to include "weapons of offence, or armour of defence," or "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Id.* at 581. To "bear arms," in turn, means to "wear, bear, or carry . . . for the

8

purpose . . . of being armed and ready for offensive or defensive action in case of conflict with another person." *Id.* at 584 (ellipses in original).

Inasmuch as a bullet must pass through an attached silencer in order to arrive at its intended target, silencers are "useth" for an offensive purpose to the same degree as a firearm itself. *Id.* Silencers are an integral part of a firearm, used to "cast . . . or strike" a bullet at another person. *Id.* Consequently, silencers are "[w]eapons of offence" deserving of Second Amendment protection. *See id.* at 582; *cf.* 26 U.S.C. § 5845(a)(7) (defining "firearm," for NFA purposes, to include firearm silencers); 18 U.S.C. § 921(a)(3) (defining "firearm," for purposes of Gun Control Act of 1968, to include firearm silencers).

Even if silencers do not qualify as protected "arms" in and of themselves, they are nevertheless eligible for Second Amendment protection as a modern-day analogue to the various firearm accessories historically considered to be arms for Second Amendment purposes. At the time of the founding, "arms" included not just a firearm itself, but also the "proper accoutrements" that rendered that firearm useful and functional. *United States v. Miller*, 307 U.S. 174, 182 (1939). In *Miller*, the Supreme Court surveyed founding-era state laws and explained that many required militia members to carry—in addition to a "musket" or "rifle"—such items as "ammunition," "one pound of powder," "twenty bullets," a box "contain[ing] not less than Twenty-four Cartridges," a "proper Quantity of Powder and Ball," and "one pound of good powder, and four pounds of lead, including twenty blind cartridges." *Id.* at 180-82. Indeed, at the time the Second Amendment was adopted, "[t]he possession of arms also implied the possession of ammunition." *Id.* at 180.

More recent historical research reveals that the items militiamen were required to carry extended even further. Based on a survey of "founding-era" "militia statutes," two

Second Amendment scholars have concluded that "the arms and accoutrements that Americans were required to possess" for militia service went well beyond firearms and ammunition. David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. Ill. U. L.J. 495, 497 (2019). Those accoutrements included, as well, "gun-cleaning equipment" such as brushes, wires, and screw drivers; holsters and scabbards for "carrying and storage"; and items used to keep firearms from decaying, such as a "cover" to "protect[] the gun lock from the elements" and wax to "protect firearms from rain." *Id.* at 497, 521-23. These objects, just as much as firearms themselves, are "necessarily part of the Second Amendment right, since they are necessary to the use of arms." *Id.* at 511-12.

The Fourth Circuit has endorsed the view, reflected in Kopel and Greenlee's article, that the Second Amendment must be read broadly to include all items "necessary to the use of arms." As the court has explained, "Early American provisions protecting the right to 'arms' were also crafted partly in response to British measures that, while not taking away guns entirely, drastically impaired their utility—suggesting 'arms' should be read to protect all those items necessary to use the weapons effectively." *Kolbe v. Hogan*, 813 F.3d 160 (4th Cir. 2016), *vacated on reh'g en banc on other grounds*, *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) ["*Kolbe II*"]. This "necessary to use" rule compels the conclusion that silencers are "arms" within the meaning of the Second Amendment because they improve the safety and efficacy of lawful firearms use.

***First,*** scientific research establishes firearms generate sound pressure levels that can permanently damage a user's hearing. The World Health Organization recommends that peak sound pressure levels ("SPLs") not exceed 140 decibels for adults and 120 decibels for

10

youth,[1] while the U.S. Occupational Safety and Health Administration and the National Institute for Occupational Safety and Health USA incorporate a peak limit of 140 decibels SPL for occupational noise exposures.[2] "Peak sound pressure levels . . . from firearms," meanwhile, "range from ∼140 to 175 [decibels]"—well above the recommended thresholds.[3] As a result, exposure to gunfire, particularly over time, "not only lead[s] to hearing loss and tinnitus"—a ringing in the ear that can become permanent—"but also contribute[s] to the development of numerous other health issues, including sleep disturbance, cardiovascular disease, and diabetes,"[4] as well as "stress, anxiety, high blood pressure, gastro-intestinal problems, and chronic fatigue."[5]

Silencers are recognized as one of "several strategies [that] can be employed to reduce the risk" of hearing damage and other health problems resulting from firearm noise exposure.[6] Indeed, the Centers for Disease Control, in two separate reports, has

---

[1] Andrew W. Smith, *The World Health Organisation and the Prevention of Deafness and Hearing Impairment Caused by Noise*, Noise Health 1:6-12 (1998).

[2] 29 C.F.R. § 1910.95; Fed. Reg. 198348469738–9744.

[3] Deanna K. Meinke et al., *Prevention of Noise-Induced Hearing Loss from Recreational Firearms*, Semin Hear. 38(4): 267–281 (Nov. 2017).

[4] Jay M. Bhatt et al., *Epidemiology of Firearm and Other Noise Exposures in the United States*, Laryngoscope, 127:E340–E346 (March 2017).

[5] Chucri A. Kardous, MS, PE, *Solutions for Preventing Lead Poisoning and Hearing Loss at Indoor Firing Ranges*, cdc.gov (May 2009), https://blogs.cdc.gov/niosh-science-blog/2009/05/18/firingrange/ (last visited July 27, 2022); *see also* U.S. Department of Veterans Affairs, Veterans Health Administration: Office of Research and Development, *Fact Sheet: VA Research on Hearing Loss* 1 (Sept. 2016), *available at* https://www.research.va.gov/pubs/docs/va_factsheets/HearingLoss.pdf (last visited July 27, 2022) ("Hearing problems — including tinnitus — are by far the most prevalent service connected disability among American Veterans.").

[6] Michael Stewart et al., *National Hearing Conservation Association Position Statement: Recreational Firearm Noise* 1 (March 2017), *available at* https://www.hearingconservation.org/assets/docs/NHCA_position_paper_on_firea.pdf (last visited July 27, 2022); *see also* Ronald Turk, *White Paper: Options To Reduce Or Modify*

11

recommended the use of silencers to reduce the unacceptably high levels of noise exposure at shooting ranges.[7] "Modern muzzle-level suppression," one study concluded, is "the *only available form of suppression* capable of making certain sporting arms safe for hearing."[8] A lawful firearm owner cannot use his weapon for self-defense in the home—the "core" right recognized by *Heller*, *see* 554 U.S. at 630—if to do so exposes him to serious and long-term health consequences.

**Second,** silencers improve firearm owners' ability to practice self-defense in other ways. Silencers can improve accuracy by reducing recoil (the backwards force that results from firing the gun) and muzzle rise (the tendency of the barrel to move up when the gun is fired).[9] And they can reduce hearing loss and disorientation immediately after firing, providing a victim additional time to defend against an attack.[10]

---

*Firearms Regulations* 6 (January 2017) ("[Silencers'] use to reduce noise at shooting ranges and applications within the sporting and hunting industry are now well recognized.").

[7] Brueck SE, et al., National Institute for Occupational Safety and Health ("NIOSH"), *Health Hazard Evaluation Report: Measurement of Exposure to Impulsive Noise at Indoor and Outdoor Firing Ranges During Tactical Training Exercises* 14, HHE Report 2013-0124-3208, *available at* http://www.cdc.gov/niosh/hhe/reports/pdfs/2013-0124-3208.pdf (last visited July 27, 2022) ("If feasible and legally permissible, attach noise suppressors to firearms to reduce peak sound pressure levels."); Lilia Chen, MS, CIH, et al., NIOSH, *Noise and Lead Exposures at an Outdoor Firing Range – California* 5, NIOSH HETA No. 2011-0069-3140 (Sept. 2011), *available at* https://www.cdc.gov/niosh/hhe/reports/pdfs/2011-0069-3140.pdf (last visited July 27, 2022) ("The *only* potentially effective noise control method to reduce students' or instructors' noise exposure from gunfire is through the use of noise suppressors that can be attached to the end of the gun barrel." (emphasis added)).

[8] Matthew Parker Branch, M.D., *Comparison of Muzzle Suppression and Ear-Level Hearing Protection in Firearm Use*, Otolaryngology – Head and Neck Surgery, 144(6):950-53 (Feb. 2011) (emphasis added).

[9] Stephen P. Halbrook, *Firearm Sound Moderators: Issues of Criminalization and the Second Amendment*, 46 Cumb. L. Rev. 33, 69 (2016).

[10] A.J. Peterman, *Second Amendment Decision Rules, Non-Lethal Weapons, and Self-Defense*, 97 Marq. L. Rev. 853, 892 n.221 (2014).

Like gun-cleaning equipment, holsters, and items that protect firearms from the elements—all of which were considered Second Amendment "arms" at the founding, *see* Kopel & Greenlee, *supra*—silencers are "necessary to use . . . weapons effectively." *Kolbe I*, 813 F.3d at 174. The Court should therefore conclude that silencers are "arms" within the scope of the Second Amendment's explicit guarantees.

### 2. Implicit protection

The Second Amendment, like all enumerated constitutional provisions, contains both explicit and implicit guarantees. *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 579 (1980) ("[T]he Court has acknowledged that certain unarticulated rights are implicit in enumerated guarantees.").[11] If an unarticulated right is "indispensable to the enjoyment of [a] right[] explicitly defined," it will "share constitutional protection in common with [the] explicit guarantee[]." *Id.*

Several circuits have applied this principle to Second Amendment claims. In *Ezell v. City of Chicago*, for instance, the plaintiffs challenged a Chicago ordinance that prohibited private citizens from using shooting ranges within city limits. 651 F.3d 684, 691-92 (7th Cir. 2011). At the first step of the then-applicable two-step framework, the Seventh Circuit began by asking "whether range training is categorically unprotected by the Second Amendment." *Id.* at 704. The court concluded it was not, since the ability to own a gun for self-defense in the home would be worthless if an owner lacked the concomitant ability to practice using it:

---

[11] Although *Richmond Newspapers* is a First Amendment case, the Supreme Court has analogized to that amendment when interpreting and applying the Second Amendment. *See Bruen*, 142 S. Ct. at 2130 ("[*Bruen*'s] Second Amendment standard accords with how we protect other constitutional rights. Take, for instance, the freedom of speech in the First Amendment, to which *Heller* repeatedly compared the right to keep and bear arms.").

"The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective." *Id.*[12] Likewise, the Ninth Circuit held in *Jackson v. City & Cty. of S.F.* that an ordinance banning the sale—but not possession—of hollow-point bullets infringed a gun owner's Second Amendment rights because "the right to possess firearms for protection implies a corresponding right to obtain the bullets necessary to use them." 746 F.3d 953, 967 (9th Cir. 2014). If a gun owner is unable to purchase the bullets he needs to practice self-defense in the home, it is irrelevant that he may possess the gun he would use to do so. A prohibition on selling ammunition therefore falls within "the historical understanding of the scope of the Second Amendment right." *Id.* at 968.

The same logic applies here. As explained above, using silencers improves accuracy, reduces disorientation after firing, and helps prevent substantial and irreversible damage to users' health. If, as *Heller* holds, the Second Amendment protects the right to use a gun for self-defense in the home, it must also protect the "corresponding right" to do so without incurring serious health risks. *Ezell*, 651 F.3d at 704; *Jackson*, 746 F.3d at 967. Regulation of the use of silencers therefore "imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *Kolbe II*, 847 F.3d at 133.

### B. The government will be unable to show a robust historical tradition of requiring gun owners to register their firearms.

Because "the Second Amendment's plain text covers [Mr. Kluge's] conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2126. Thus § 5861 is

---

[12] *Bruen* described the first step of the old "two-step approach" as "broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." 142 S. Ct. at 2127. *Bruen*'s rejection of means-ends balancing therefore does not disturb the Seventh Circuit's conclusion at step one of the pre-*Bruen* framework.

14

unconstitutional unless the government can "demonstrate that the [statute] is consistent with this Nation's historical tradition of firearm regulation." *Id.* To carry that burden, the government must show, first, that § 5861 "addresses a general societal problem"—either one that "has persisted since the 18th century" or one that is "unprecedented" and was not "specifically anticipated" by the Founders. *Id.* at 2131-32. But the government will be unable to clear even this preliminary hurdle, as silencers do not pose any kind of societal problem, whether of older vintage or newer.

Possession of silencers is legal in 42 states, including Maryland—a state with some of the toughest gun laws in the country.[13] This overwhelming majority of states suggests "the national consensus is that firearm suppressors are not a threat to society worth heavily regulating."[14] Indeed, the use of silencers to commit crimes is exceedingly rare.[15] Between 2012 and 2015, only 390 silencers were recovered from crime scenes where an ATF trace

---

[13] Pulsar, Suppressor Laws and Practices 2021, https://pulsarnv.com/blogs/news/suppressor-laws-and-practices-2021#:~:text=Suppressors%20are%20legal%20to%20own,during%20hunting%E2%80%94Connecticut%20and%20Vermont. (last visited July 27, 2022).

[14] Justin Stevens, *Reloading the Second Amendment: The Undue Burdens of the National Firearms Act and Their Remedies*, 49 Tex. Tech L. Rev. Online Edition 148, 175 (2017); *see also* Steve Chapman, *Gun Silencers are Nothing to Fear*, Chicago Tribune (January 14, 2017, 2:38 PM), http://www.chicagotribune.com/columns/steve-chapman/ct-gun-silencer-legalize-perspec-0115-md-20170113-column.html ("Chicago has a lot of bloodshed, including 762 homicides and more than 3,500 shootings, last year, but silencers figure in little or any of it. Anthony Guglielmi, a spokesman for the Chicago Police Department, told me, 'We seldom recover silencers. Sometimes you may get a gun with a makeshift silencer, but even that is rare.'"); Bob Owens, Opinion, *Gun Silencers are Useful, not Scary*, L.A. Times (Feb 29, 2016, 7:01), https://www.latimes.com/opinion/op-ed/la-oe-0229-owens-silencers-20160229-story.html.

[15] Turk, *White Paper* at 6 ("[S]ilencers are very rarely used in criminal shootings.").

was requested—compared to more than 600,000 pistols in the same period.[16] In any given year, only 0.003 percent of silencers are used to commit a crime,[17] and the ATF recommended an average of only "44 defendants a year for prosecution on a silencer-related violations" in a recent ten-year period.[18] The infrequency of silencers' use in crime may be a product of their cumbersomeness: "[a] silencer always extends the length of the overall weapon, as well as increasing the barrel diameter. The increased difficulty of concealment may make silencers less appealing to criminals than they might be otherwise sound."[19] It is perhaps unsurprising, then, that "[s]urveys of inmates show that they prefer concealable, large caliber guns."[20]

Regardless, the only comprehensive, data-driven study on the issue concluded that "use of silenced firearms in crime is a rare occurrence, and is a minor problem."[21] This study revealed that in comparison with non-silenced firearms, silencer-equipped guns are "only one-third as likely to be used to kill or injure, one-half as likely to be actively employed, and one-half as likely to be used by someone with a prior record."[22] As the report put it, "Guns equipped with a silencer, rather than being more dangerous and more likely to be used by

---

[16] Nathan Rott, *Debate Over Silencers: Hearing Protection or Public Safety Threat?*, All Things Considered (NPR Mar. 21, 2017), http://www.npr.org/2017/03/21/520953793/debate-over-silencers-hearing-protection-or-public-safety-threat.

[17] Gutowski, *ATF: 1.3 Million Silencers in U.S. Rarely Used in Crimes*, Washington Free Beacon (Feb. 17, 2017).

[18] Turk, *White Paper* at 6.

[19] P. Clark, *Criminal Use of Firearm Silencers*, 8 W. Crim. Review 44, 53 (2007).

[20] Marianne W. Zawitz, U.S. Dep't of Justice, Guns Used in Crime 1 (1995), *available at* http://bjs.ojp.usdoj.gov/content/pub/pdf/GUIC.PDF (last visited July 27, 2022).

[21] Clark, *Criminal Use* at 53.

[22] *Id.*

professional criminals or repeat offenders, are far less dangerous and less likely to be employed by professional criminals."[23] In short, § 5861(d) is a solution to a problem that does not exist, and the Court can invalidate the statute on that basis alone, as *Bruen* permits only those gun regulations that "addresses a general societal problem." 142 S. Ct. at 2131.

But even if the government can demonstrate that silencers pose a general societal problem, it will be unable to establish a robust "tradition" of "broadly" requiring owners to register their silencers with the government. *Id.* at 2138. Other than the NFA, Mr. Kluge's research has uncovered only a single statute that required registration of silencers before the mid-20th century. That statute, adopted by Michigan in 1913, provided that "[e]very person, firm or corporation engaged in any way or to any extent in the business of selling at retail guns, pistols, other fire-arms and silencers for fire-arms shall keep a register in which shall be entered" certain information, including data about the purchaser of a silencer and the silencer's "mark of identification."[24] The Michigan statute further required firearm sellers to make their registers available to "peace officers" for inspection at all times.[25]

In addition, a small smattering of other states enacted registration requirements before the middle of the twentieth century, though for different types of arms. California and Oregon, for instance, passed statutes in 1917 that required anyone in the business of selling

---

[23] *Id.*; *see also State v. Langlois*, 2 N.E. 3d 936, 957 (Ohio Ct. App. 2013) ("[T]he use of suppressors in gun crimes generally and in homicides specifically is extremely infrequent, and the criminal use of a registered suppressor is virtually nil relative to their widespread ownership.").

[24] 1913 Mich. Pub. Acts 472, An Act Providing for the Registration of the Purchasers of Guns, Pistols, Other Fire-arms and Silencers for Fire-arms and Providing a Penalty for Violation, § 1 (Ex. A).

[25] *Id.*

17

concealable weapons to keep a register of the sale of such weapons.[26] And in 1931, Illinois mandated that "[e]very manufacturer or merchant shall keep a register of all machine guns manufactured or handled by him."[27] But these statutes are insufficient to discharge the government's burden, for at least three reasons.

***First,*** the statutes Mr. Kluge has uncovered appear to be "outliers." *Bruen*, 142 S. Ct. at 2153. Depending on how one counts, at most eleven states and two municipalities passed registration statutes before the mid-20th century.[28] The Court in *Bruen* "doubt[ed]" that statutes from three of the original thirteen colonies—or roughly 23 percent—"could suffice

---

[26] 1917 Cal. Sess. Laws 221-225, An act relating to and regulating the carrying, possession, sale or other disposition of firearms capable of being concealed upon the person § 7 (Ex. B); 1917 Or. Sess. Laws 804-808, An Act Prohibiting the manufacture, sale, possession, carrying, or use of any blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, dirk, dagger or stiletto, and regulating the carrying and sale of certain firearms, and defining the duties of certain executive officers, and providing penalties for violation of the provisions of this Act, § 5 (Ex. C).

[27] 1931 Ill. Laws 453, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, § 4 (Ex. D).

[28] In addition to the statutes from Michigan, California, Oregon, and Illinois, see 1911 N.Y. Laws 444-45, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 2 (Ex. E); 1933 Wyo. Sess. Laws 117, An Act Relating to the Registering and Recording of Certain Facts Concerning the Possession and Sale of Firearms by all Wholesalers, Retailers, Pawn Brokers, Dealers and Purchasers, Providing for the Inspection of Such Register, Making the Violation of the Provisions Hereof a Misdemeanor, and Providing a Penalty Therefor, ch. 101, §§ 1-4 (Ex. F); 1933 S.D. Sess. Laws 245-47, An Act Relating to Machine Guns, and to Make Uniform the Law with Reference Thereto, ch. 206, §§ 1-8 (Ex. G); 1931-1933 Wis. Sess. Laws 245-47, An Act . . . Relating to Machine Guns and to Make Uniform the Law with Reference Thereto, ch. 76, § 1, pt. 164.01 to 164.06 (Ex. H); 1933 Haw. Sess. Laws 36-37, An Act Regulating the Sale, Transfer, and Possession of Firearms and Ammunition, § 3 (Ex. I); 1934 Va. Acts 137-39, An Act to define the term "machine gun"; to declare the use and possession of a machine gun for certain purposes a crime and to prescribe the punishment therefor, ch. 96, §§ 1-7 (Ex. J); 1934 S.C. Acts 1288, An Act regulating the use and possession of Machine Guns, §§ 1-6 (Ex. K); George Manierre, The Revised Charter and Ordinances of the City of Chicago: To Which are Added the Constitutions of the United States and State of Illinois Page 123-125, Image 131-133 (1851) (Ex. L); The Charter and Ordinances of the City of St. Paul, (To August 1st, 1863, Inclusive,) Together with Legislative Acts Relating to the City. Page 166-167, Image 167-168 (1863) (Ex. M).

to show a tradition" of firearm regulation. *Id.* at 2142. Eleven states out of 48 (the number admitted to the Union as of 1912) also make up 23 percent of the total. These registration statutes, therefore, are not "representative" in the way *Bruen* demands. *Id.* at 2133.

**Second,** and more important, these statutes almost exclusively address different problems from the "general societal problem" at which § 5861(d) is supposedly targeted. As explained above, only the Michigan statute required registration of silencers specifically. The others pertain to different types of firearms, e.g., machineguns or guns that can be carried concealed on the person.[29] Whatever purpose a silencer-registration requirement serves, it is not the same purpose served by requiring registration of fully automatic machineguns. These statutes are therefore not "relevantly similar" to § 5861(d). *Id.* at 2132.

**Third,** none of these statutes was enacted in the period that *Bruen* deems crucial—the years immediately surrounding the founding. The oldest registration requirement Mr. Kluge has discovered dates to 1851, sixty years after the Second Amendment's ratification in 1791. With two exceptions, the others are all creatures of the 20th century.[30] Such recent evidence is irrelevant to the Second Amendment analysis unless it "confirm[s]" what earlier sources have already established, *id.* at 2137, which is not the case here. Indeed, the Court in *Bruen* declined even to "address any of the 20th-century historical evidence brought to bear by respondents" because it "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id.* at 2153 n.28. The same is true of the registration statutes cited above.

---

[29] *See supra*, notes 26-28, and sources cited therein.
[30] *See supra*, notes 26-28, and sources cited therein.

Unless the government can bring forward additional historical evidence of which Mr. Kluge is unaware, it will be unable to establish a broad historical tradition of requiring registration of firearm silencers. Section 5861(d) therefore violates the Second Amendment.

## III. Conclusion

For the reasons described above, the Court should dismiss the indictment against Mr. Kluge.

Respectfully submitted,

James Wyda
Federal Public Defender

_____/s/_____
Maggie Grace (#29905)
Cullen Macbeth (#810923)
Assistant Federal Public Defenders
100 South Charles Street
Tower II, 9th Floor
Baltimore, MD 21202
(410) 962-3962
Maggie_grace@fd.org
Cullen_macbeth@fd.org